## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kyle McNair-Robinson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DAZN US LLC d/b/a DAZN<br><br>Defendant. | Civil Action No. 1:24-cv-06816-AS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kyle McNair-Robinson ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant DAZN US LLC. ("DAZN" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>NATURE OF ACTION</u>

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription sports broadcasting and streaming services across its network sites (collectively, the "DAZN Subscriptions," enumerated below) through its website, www.dazn.com (the "DAZN Website"). Defendant is a subscription sports broadcaster and streaming service that, among other activities, streams live sporting events to audiences throughout the country. Relevant to Plaintiff's allegations, when customers sign up for a DAZN Subscription to gain access to a live stream through the DAZN Website, Defendant enrolls customers in a program that automatically renews customers' DAZN Subscription on a monthly or yearly basis and results in monthly or yearly charges to customer's credit card, debit

card, or third-party payment account (collectively, "Payment Method"). In doing so, Defendant

fails to provide the requisite disclosures and authorizations required to be made to to California

consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§

17600, *et seq.*

2.      Through the DAZN Website, Defendant markets, advertises, and sells paid

memberships to consumers throughout the United States, which include broadcasting and

streaming services for various niche sports, including boxing and mixed martial arts ( the

"DAZN Subscriptions").[1] To sign up for one of Defendant's DAZN Subscriptions through the

DAZN Website, customers must provide Defendant with their billing information, and

Defendant then automatically charges customers' Payment Method as payments are due,

typically on a monthly or yearly basis. Defendant can unilaterally charge its customers' renewal

fees without their consent, as Defendant is in possession of its customers' billing information.

Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated

customers on a monthly or yearly basis, absent their consent under the ARL, absent the requisite

disclosures under the ARL, and in reliance on consumer confusion and inertia, so as to retain

customers, combat consumer churn, and bolster its revenues.

3.      Pursuant to the ARL, online retailers who offer automatically renewing

subscriptions to California consumers must: (i) provide the complete automatic renewal offer

terms in a clear and conspicuous manner and in visual proximity to the request for consent prior

to completion of the enrollment process, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain

---

[1] The DAZN Subscriptions include the "Monthly Flex," which auto-renews for $29.99 excluding taxes and fees and renews on a monthly basis; "Monthly Saver" (presently termed "Annual-pay monthly"), which auto-renews for $19.99/month excluding taxes and fees and requires a one-year commitment; and the "Annual Super Saver," which auto-renews for $224.99 excluding taxes and fees and renews on a yearly basis.

consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

4.      As discussed in greater detail below, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3). *See* Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3); *see also id*. § 17601(b)(1)-(5) (setting forth the definition of "automatic renewal offer terms" as used in Cal. Bus. Prof. Code § 17602(a)). The acknowledgment email also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation. In fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their DAZN Subscriptions, in violation of Section 17602(c) of the ARL.

5.      As a result, Defendant's DAZN Subscriptions are deemed to be "unconditional gifts" under the ARL, entitling Plaintiff and the Class to restitution. *See* Cal. Bus. & Prof. Code § 17603. Plaintiff and the Class also suffered monetary damages as a result of Defendant's violation of the ARL through its DAZN Subscription offerings.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this lawsuit under the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there

are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000,

exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member

are domiciled in different states.

7.      This Court has general jurisdiction over Defendant because Defendant maintains

its principal place of business within this District.

8.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because Defendant resides in this District and a substantial part of the events giving rise to

Plaintiff's claims took place within this District.

## PARTIES

9.      Plaintiff Kyle McNair-Robinson is a citizen of California who resides in

Riverside, California. On or around July 13, 2024, Mr. McNair-Robinson purchased a yearly

DAZN Subscription ("Monthly Saver") from Defendant's Website while residing in California.

During the enrollment process, but before finally consenting to Defendant's subscription

offering, Mr. McNair-Robinson provided his Payment Method information directly to

Defendant. At the time that Mr. McNair-Robinson enrolled in his DAZN Subscription program,

Defendant did not disclose to Mr. McNair-Robinson all of the required automatic renewal offer

terms associated with the subscription program or obtain Mr. McNair-Robinson's affirmative

consent to those terms. Further, after Mr. McNair-Robinson completed his initial order,

Defendant sent Mr. McNair-Robinson an email confirmation and receipt for his purchase of and

enrollment in the DAZN Subscription (the "Acknowledgment Email"). However, the

Acknowledgment Email, too, failed to provide Mr. McNair-Robinson with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Mr. McNair-Robinson's DAZN Subscription in a manner capable of being retained by him. Mr. McNair-Robinson did not receive any other acknowledgment that contained the required information. As a result, Mr. McNair-Robinson was not placed on notice of several material terms associated with his DAZN Subscription. In particular, Mr. McNair-Robinson was not made aware of the recurring price to be charged upon renewal, the length of the renewal term, when the first charge would occur, or the complete cancellation policy associated with his DAZN Subscription: the most crucial aspects of which were missing from the Checkout Page and Acknowledgment Email. In any event, shortly after Mr. McNair-Robinson first signed up for his DAZN Subscription, Mr. McNair-Robinson learned upon reviewing his billing statements and banking history that, notwithstanding the confusing terms of his DAZN Subscription, Defendant enrolled Mr. McNair-Robinson into its year-long term of monthly automatic-renewal subscription charges and, without Mr. McNair-Robinson's affirmative consent, charged Mr. McNair-Robinson's Payment Method the monthly rate of $19.99 associated with his DAZN Subscription—resulting from Defendant's inadequate ARL disclosures and its deceptive Checkout Page design. After this discovery, Mr. McNair-Robinson emailed Defendant through the DAZN Website to avoid incurring any future charges in connection with his DAZN Subscription. After his attempted cancellation failed, Mr. McNair-Robinson subsequently sent an email to Defendant on August 13 and 14, 2024, requesting for Defendant to cancel his DAZN Subscription. Defendant, however, refused to honor Mr. McNair-Robinson's request and repeatedly attempted to charge Mr. McNair-Robinson Payment Method –which Mr. McNair-Robinson was forced to block through

his credit card provider. Notwithstanding this fact, Defendant continues to attempt to charge Mr. McNair-Robinson's Payment Method on a daily basis, leading to excessive transaction declinations and the looming threat that Defendant might charge Mr. McNair-Robinson the full amount of his yearly subscription in one lump sum as liquidated damages (as per the hidden cancelation policy of the DAZN Subscription). Had Defendant complied with the ARL, Mr. McNair-Robinson would have been able to read and review the auto renewal terms prior to purchase, and he would not have subscribed to the DAZN Subscription at all or on the same terms. Additionally, Mr. McNair-Robinson paid a premium for Defendant's DAZN Subscription resulting from Defendant's violations of the ARL. As a direct result of Defendant's violations of the ARL as alleged herein, Mr. McNair-Robinson suffered an economic injury. The facts giving rise to Mr. McNair-Robinson's claims are materially the same as those of the Class he seeks to represent.

10.    Defendant DAZN US LLC. ("DAZN US") is a Delaware corporation with its principal place of business located in One World Trade Center, 71st Floor, Suite G, New York, NY 10007. For purposes of diversity, DAZN US's sole member is DAZN Limited ("formerly known as "Perform Investment Limited"),[2] an entity incorporated and headquartered in the United Kingdom.[3] Both DAZN Limited and DAZN US are wholly owned subsidiaries of DAZN Group Limited, an entity incorporated in the United Kingdom with its principal place of business located at 12 Hammersmith Grove, London, England, W6 7AP, United Kingdom.[4]

---

[2] https://find-and-update.company-information.service.gov.uk/company/09676399

[3] Exhibit A at pg. 5.

[4] *Id.* at pgs. 24, 26.

## FACTUAL ALLEGATIONS

### A.  Background On The Subscription e-Commerce Market

11.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[5] Subscription e-commerce services target a wide range of customers and cater to a variety of specific interests. Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years. Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[6] Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[7] That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally.[8]

---

[5] *See* https://www.coredna.com/blogs/ecommerce-subscription-services.

[6] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (January 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[7] *See* UBS, *Investing in digital subscriptions* (March 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%."). *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (April 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (October 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right- now-but are-you-reaping-the-full-benefits-02434851.

[8] UBS, Investing in digital subscriptions (Mar. 10, 2021), supra ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); see also Juniper Research, Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake

12.     As noted above, the production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years. According to Forbes, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[9]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[10]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow generation."[11]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[12]

13.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover. During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[13]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise

---

(acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[9] The State Of The Subscription Economy, 2018, Forbes (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[10] See UBS, Investing in digital subscriptions (Mar. 10, 2021), available at https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[11] *Id.*

[12] *Id.*

[13] UBS, Investing in digital subscriptions (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[14]

14.    However, as *The Washington Post* has noted, there are downsides associated with the subscription-based business model. While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[15] In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[16]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[17]  As these companies have realized, "[t]he real money is in the inertia."[18]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[19]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of

---

[14] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[15] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers*, (February 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking- inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[16] *Id.*

[17] Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (April 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[18] *Id.*

[19] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (June 25, 2019), https://www.businessinsider.com/dark-patterns-online- shopping-princeton-2019-6.

subscriptions to trick users into signing up for expensive and recurring plans. They do this by

intentionally confusing users with their app's design and flow, … and other misleading

tactics[,]" such as failure to fully disclose the terms of its automatic-renewal programs.[20]

15.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest

complaints consumers have about brand/retailers is that it's often difficult to discontinue a

subscription marketing plan."[21] Moreover, "the rapid growth of subscriptions has created a host

of challenges for the economy, far outpacing the government's ability to scrutinize aggressive

marketing practices and ensure that consumers are being treated fairly, consumer advocates

say."[22]  Thus, although "Federal Trade Commission regulators are looking at ways to make it

harder for companies to trap consumers into monthly subscriptions that drain their bank accounts

[and] attempting to respond to a proliferation of abuses by some companies over the past few

years[,]"[23]  widespread utilization of these misleading dark patterns and deliberate omissions

persist.

16.     Defendant has successfully implemented this tactic. According to Bloomberg, as

of date, DAZN has more than 800,000 subscribers.[24] Defendant's rapid growth of its audience

base coincides with a sharp decline in subscriber satisfaction as the DAZN Subscriptions and the

---

[20] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (October 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[21] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[22] *Id.*

[23] *Id.*

[24] Boxing Junkie, *DAZN hits 8 million global subscribers, according to report* (December 8, 2020), https://boxingjunkie.usatoday.com/2019/11/dazn-hits-8-million-global-subscribers-according-to-report.

platforms from which they operate have become riddled with "dark patterns."  Specifically,

Defendant has used various types of dark patterns, including but not limited to "Roach Motel,"[25]

"Misdirection,"[26] and "Forced Continuity," [27] in order to prevent users from canceling their

DAZN Subscriptions by way of adopting complex cancellation procedures to increase the

friction in the subscription cancellation process.

## B.    Defendant's Dark Patterns And Online Consumer Complaints About The DAZN Subscriptions

17.    Defendant's recent growth in revenue and subscriber count of its DAZN

Subscriptions coincides with a sharp decline in customers' satisfaction as the DAZN Website

and accompanying marketing have become riddled with dark patterns. In fact, Defendant's

conduct has drawn the attention and ire of customers across the country, with countless angry

customers taking to the Internet to voice their discontent over Defendant's deceitful tactics. The

defendant's conduct has also drawn media coverage. For instance, one of the various news

articles covering Defendant's use of dark patterns reported that Defendant's Website

purposefully "lock customers into one-year contracts using sneaky sales tactics."[28]

---

[25] "Roach Motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[26] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another."  In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]"  https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[27] One example of "Forced Continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning.  [The subscriber is] are then not given an easy way to cancel the automatic renewal."  https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

[28] TechHive, *DAZN streaming service: Reviving one of cable's worst features* (July 13, 2023), https://www.techhive.com/article/1991899/dazn-streaming-service-reviving-one-of-cables-worst-features.html

18.     Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the actual price and terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their DAZN Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid DAZN Subscriptions plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

**C.     California's Automatic Renewal Law**

19.     In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600 (statement of legislative intent). More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online. The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements. *See* Cal. Bus. & Prof. Code §§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

20.     The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1) Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the

trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

(2)  Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

(3)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

21.    As of 2018, the updated ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*. If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id*. Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

22.    Section 17602(c) of the ARL further provides:

A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address**, a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c). (emphasis added).

23.    Additionally, following the 2018 and 2022 amendments to the ARL, the updated law also requires e-commerce sellers, doing business in California, to allow online cancellation

of auto-renewing memberships or recurring purchases that were initiated online.  Specifically,

Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic
> renewal or continuous service offer online shall allow a consumer
> to terminate the automatic renewal or continuous service
> ***exclusively online, at will, and without engaging any further
> steps that obstruct or delay the consumer's ability to terminate
> the automatic renewal or continuous service immediately***.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

24.    The updated ARL further specifies that a seller who provides an automatic offer

"shall provide a method of termination that is online in the form of either of the following: (A) A

prominently located direct link or button which may be located within either a customer account

or profile, or within either device or user settings[; or] (B) By an immediately accessible

termination email formatted and provided by the business that a consumer can send to the

business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

25.    Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or

arrangement in which a paid subscription or purchasing agreement is automatically renewed at

the end of a definite term for a subsequent term."  Cal. Bus. & Prof. Code § 17601(a).

26.    Section 17601(b) of the ARL defines the term "Automatic renewal offer terms"

as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing

agreement will continue until the consumer cancels.  (2) The description of the cancellation

policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's

credit or debit card or payment account with a third party as part of the automatic renewal plan

or arrangement, and that the amount of the charge may change, if that is the case, and the

amount to which the charge will change, if known.  (4) The length of the automatic renewal term

or that the service is continuous, unless the length of the term is chosen by the consumer.  (5)

The minimum purchase obligation, if any."  Cal. Bus. & Prof. Code § 17601(b).

27.    Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly

and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font,

or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

28.    Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

29.    As alleged below, Defendant's practices on the DAZN Website systematically violates Sections 17602(a)(1), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**D.    Defendant's Business: The Subscription Enrollment Process**

30.    At all relevant times, Defendant offered, via the DAZN Website, the DAZN Subscriptions, which give consumers access to its video streaming services. These paid subscriptions are offered on a recurring basis for monthly and/or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels.

31.    By way of example, when consumers sign up for a monthly DAZN Subscription they are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel. Similarly, customers who sign up for an annual DAZN Subscription are charged monthly for a one-year period and, at the end of the initial one-year period, automatically renewed and typically charged the full amount, paid on a monthly basis, for the next year, and every year thereafter if they do not cancel. Defendant's DAZN Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of Cal. Bus. & Prof. Code § 17601.

32.     Consumers can sign up for one of Defendant's subscription plans through the DAZN Website. Defendant automatically enrolls customers who purchase a paid DAZN Subscription via the DAZN Website in their chosen DAZN Subscription program going forward, by default.

33.     The enrollment process for each DAZN Subscription is substantially the same, regardless of the medium used. After selecting a subscription option, consumers are directed to subsequent webpages on the DAZN Website, where they are prompted to create a membership account and input their name and user password. After these steps, consumers are directed to another, final webpage (the "Checkout Page"), where prospective subscribers are invited to complete their purchases. For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears in visual proximity to the request for consent to the offer, which in this case pertains to the block of text located immediately above the final "Start Subscription" button that customers must click to complete the checkout process.

34.     By way of example, at least as of September 2024, when a consumer signed up for a DAZN Subscription via his or her computer web browser, the "relevant portion of the Checkout Page" refers to the disclosures in the block of grey text above the "Start Subscription" button (*i.e.*, the "request for consent"), which contains the following language and appearance (red box added for emphasis):[29]

---

[29] The Checkout Page for the Monthly Flex Subscription is identical in design and layout as the Monthly Saver Subscription plans. The only difference between the two is that the monthly ARL disclosure is even more inadequate; it merely states: "Cancel with 30 days' notice. T&Cs apply."



35.     Regardless of how the consumer subscribes (via the DAZN Website on its mobile or desktop format), and irrespective of which particular DAZN Subscription plan the consumer selects, Defendant fails to disclose the full terms of its auto-renewal program either before or after checkout, and it never requires the individual to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for Defendant's DAZN Subscriptions. Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before charging consumers' Payment Methods on a recurring basis.

**E.       Defendant Violates California's Automatic Renewal Law**

36.      At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their DAZN Subscriptions, in violation of Cal. Bus. & Prof. Code §§ 17602(c) and 17602(d).

**i.       Defendant Fails To Clearly And Conspicuously Present The DAZN Subscription Automatic Renewal Terms**

37.      As explained in greater detail below, the relevant portion of the Checkout Page containing the purported automatic renewal offer terms is not "clear and conspicuous" as required under the statute. See Cal. Bus. & Prof. Code § 17601(c). First, Defendant fails to clearly and conspicuously disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1). As illustrated by the Checkout Page above, although the Checkout Page mentions that DAZN Subscription constitutes a "12 Month Contract plan [which] will renew automatically on 09/06/2025," *see supra* ¶ 34, this

disclosure is inadequate because it fails to specify that consumers are even enrolling in an

"annual subscription" in the first place. Specifically, the much more conspicuous preceding text

to that sentence states "Today you pay $19.99," which is underscored by the surrounding text

stating "$19.99/month" and that the "[n]ext payment [is due] on 10/06/2024" for "$19.99." *Id.*

As such, the Checkout Page's textual references to "Annual – pay monthly" and "12 Month

Contract plan" are contradicted by the more prominent surrounding text – leading unsuspecting

consumers to believe that they are making a single purchase or entering into a monthly

subscription whose price will remain constant for a year. *Id.* These interpretations are reinforced

by the fact that the DAZN Subscription, until very recently, was captioned "Monthly Saver." *Id.*

Thus, the Checkout Page does not clearly and conspicuously state that consumers agreed to a

yearly subscription. More importantly, the relevant portion of the Checkout Page merely states

that "[b]y signing up [consumers] agree that [their] subscription starts immediately" without

referencing the length of the subscription ***at all***. *Id.* Aside from being inconspicuous, as

discussed in greater depth below, the Checkout Page thus fails to disclose that the DAZN

Subscription will continue to automatically renew until it is canceled in the manner required by

the ARL. As such, Defendant fails to disclose "[t]hat the subscription or purchasing agreement

will continue until the consumer cancels," *id.* § 17601(b)(1), in the manner required by the

statute. *See id.* § 17602(a)(1).

      38.    Second, Defendant fails to disclose "[t]he description of the cancellation policy

that applies to the offer."  Cal. Bus. & Prof. Code § 17601(b)(2). Specifically, although the

Checkout Page states that consumers can "[c]ancel this auto-renewal in [their] Account," *supra* ¶

34, it fails to indicate the cutoff date for doing so. Further, neither the Checkout Page nor the

"Terms of Use" on the DAZN Website indicates the time zone that applies to the cutoff date—

*e.g.*, Eastern, Central, or Pacific Time. Furthermore, Defendant fails to specify the consequences of canceling the DAZN Subscriptions. For instance, although the relevant portion of the Checkout Page indicates that consumers may "cancel" their "auto-renewal," *id.*, Defendant does not disclose that if a consumer "default[s] in the payment of any installment [of the DAZN Subscription] then if the default is not remedied within a period of 5 days from the date the payment was due, all outstanding payments, up to the end of the minimum term of the [DAZN] Subscription, will become due immediately."[30] Defendant's omission of this policy is clearly a material omission of fact. If consumers were aware of Defendant's onerous liquidated damages, they would not have purchased the DAZN Subscription or would have canceled it before the deadline. As such, Defendant also fails to clearly and conspicuously describe "[t]he description of the cancellation policy that applies to the offer," *id.* § 17601(b)(2), in the manner required by the statute. *See id.* § 17602(a)(1).

39.    Third, the Checkout Page does not clearly and conspicuously disclose "[t]he recurring charges that will be charged to the consumer's Payment Method as part of the automatic renewal plan or arrangement."  Cal. Bus. & Prof. Code § 17601(b)(3). Specifically, although the Checkout Page indicates that consumers' "subscription will renew automatically," at "$19.99 /month," *supra* ¶ 34, Defendant fails to disclose how much money consumers will be charged **each subsequent year**. Furthermore, the Checkout Page fails to disclose the total price of the DAZN Subscriptions inclusive of applicable taxes. Most egregiously, the Checkout Page also fails to disclose that Defendant "reserve[s] the right to increase the price for Paid Subscriptions and/or Add-On Events at any time."[31]Aside from being inconspicuous, as

---

[30]https://help.dazn.com/hc/en-us/articles/16391473315101-Terms-of-Use (last accessed September 6, 2024).

[31] *Id.*

discussed in greater depth below, the Checkout Page fails to disclose "[t]he recurring charges

that will be charged to the consumer's credit or debit card or payment account with a third party

as part of the automatic renewal plan or arrangement," *id*. § 17601(b)(3), in the manner required

by the statute. *See id*. § 17602(a)(1).

> **ii.     Defendant Fails To Clearly And Conspicuously Present The DAZN Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

40.     Because Defendant failed to present the full automatic renewal terms of its DAZN

Subscriptions on its Checkout Page, as required by the ARL, it, therefore, failed to present the

material terms of its DAZN Subscriptions before Plaintiff and the Class members made their

purchases in violations of the ARL. Cal. Bus. & Prof. Code § 17602(a)(1). Further, even if

Defendant had presented the full automatic renewal terms of its DAZN Subscription (it did not),

those terms were not presented in a "clear and conspicuous" manner or "in visual proximity" to

the request for consent of the DAZN Subscriptions in violation of the ARL.

41.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and

conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or

color to the surrounding text of the same size, or set off from the surrounding text of the same

size by symbol ls or other marks, in a manner that clearly calls attention to the language." *Id.* §

17601(c). Defendant's inadequate automatic renewal terms fall well short of the mark of being

conspicuous as defined under the ARL. Specifically, the terms are not "clear and conspicuous"

because they are smaller than the text featured in and under the payment headers above, which

fill up at least 60% of the Checkout Page. *See supra* ¶ 34. Additionally, the terms, which appear

in a tiny gray 9-point font, without emphasis, and against a grey background, are illegible to the

naked eye, even on a large computer screen, without increasing the zoom level. *Id.* At the same

time, the illegible terms are much less obvious or noticeable than the text in the payment headers (written in bold 12-point font) or the Credit payment forms (written in a white bold 12-point against a black background). *Id.* Finally, the terms are not even tied, or in close visual proximity, to the large call-to-action button, which immediately becomes highlighted after a consumer finishes entering their payment information (drawing attention away from the faint grey text at issue). The "Start Subscription" text above the call-to-action button, which vaguely states, "[b]y signing up you agree that your subscription starts immediately," also appears in 9-point font, without emphasis, and against a grey background. *Id.* Based on the above, Defendant's deceptive Checkout Page does not clearly and conspicuously call attention to its otherwise inadequate automatic renewal terms as required under the statute. *See id.* § 17602(a)(1).

> ### iii.    Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Terms Associated With The DAZN Subscriptions

42.    Furthermore, at no point during the checkout process does Defendant require consumers to read or affirmatively agree to any terms of service associated with their DAZN Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(a)(2). In fact, as discussed above, the only terms that Plaintiff and the Class members could have purportedly agreed to, even without a checkbox manifesting affirmative consent, was that "[b]y signing up you agree that your subscription starts immediately." *See supra* ¶ 34. That text, however, does not otherwise state that, by clicking the call-to-action button, consumers also agreed to the specific terms of the DAZN Subscriptions. Thus, at no point, during the enrollment process or on the Checkout Page, was there an unambiguous or affirmative consent to Defendant's automatic renewal terms in violation of the ARL. *Id.* § 17602(a)(2)

iv.    **Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required DAZN Subscription Offer Terms.**

43.    Finally, after Plaintiff and the Class members subscribed to one of Defendant's DAZN Subscription plans, Defendant sent email follow-ups regarding their purchases (the "Acknowledgment Emails").

44.    By way of example, as of 2024, the subject line of the email stated: "Your subscription for DAZN has started." The body of the email contained, in relevant part, the following text and images:

**[Intentionally Left Blank]**



# Thank you for joining DAZN

Hi .

Your subscription for DAZN has started. See below for confirmation of your subscription.

Watch the best live sports anywhere.
Download the DAZN app to watch your sport whenever and wherever you want - on your TV, gaming console, phone, tablet, and other connected devices.

**WATCH NOW**

**Information about your subscription:**

**Payment term:** Monthly
**Subscription duration:** Minimum term 12 months
**Amount:** 22.62 USD
**Subscription start date:** 2024-09-05
**Subscription end date:** 2025-09-05

At any time, you can see full details and manage your subscription in My Account.

If you have any questions or require additional support, visit our Help Center or Contact Us.



This email was sent to you as a registered member of DAZN.com

45.     The Acknowledgment Email suffers from substantially the same deficiencies as the Checkout Page for the DAZN Subscriptions described above. As in the Checkout Page, disclosures of these required automatic renewal terms are either missing altogether, are deceptively incomplete, objectively inaccurate, and/or are inconspicuous. As a result, the Acknowledgment Email further violates the ARL. Cal. Bus. & Prof. Code §§ 17602(a)(3) and 17602(b).

46.     Additionally, the Acknowledgment Emails fail to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and, in fact, Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their DAZN Subscriptions, which further violates the ARL. *See id.* § 17602(c).

* * *

47.     In sum, Defendant's deficient pre- and post-purchase disclosures and lack of attainment of affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL.  As a result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the automatic renewal of their continuous service agreements are deemed "unconditional gifts" pursuant to ARL. Cal. Bus. & Prof. Code § 17603.

48.     Because Defendant failed to disclose this material information in the manner required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent to Defendant's offer or knowingly enter into the purchase agreements.  Thus, as a direct result of Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in the Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate, and unlawfully charged for his DAZN Subscription.

49.     Further, as a direct result of Defendant's unlawful conduct described above, Plaintiff and the Class members have incurred substantial financial injury in the form of all

monies withdrawn from their Payment Methods in connection with the DAZN Subscriptions. Specifically, Defendant's ARL violations concerning the DAZN Subscriptions caused Plaintiff's and Class members' financial injury because they reasonably relied on the conspicuous disclosures of Defendant's Checkout Page and Acknowledgment Email (and, as a natural corollary, the omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase their DAZN Subscriptions in the first place and whether to continue paying for them after that (*i.e.*, by not canceling the auto-renewal). Finally, Plaintiff and the Class members paid a premium for Defendant's DAZN Subscription resulting from Defendant's violations of the ARL.

## CLASS ALLEGATIONS

50.     Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in California, who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's DAZN Subscription offerings.

51.     The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

52.     Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

53.     ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

54.     *Numerosity*: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

55.     ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all the Class members and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

(a)     Whether Defendant's DAZN Subscriptions constitute "automatic renewal" plans within the meaning of the ARL;

(b)     Whether Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of the ARL;

(c)     Whether Defendant charged Plaintiff's and the Class members' Payment Method for an automatic renewal service without first obtaining their affirmative consent to the automatic renewal offer terms in violation of the ARL;

(d)     Whether Defendant failed to provide an acknowledgment that included the automatic renewal terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class members, in violation of the ARL.;

(e)     Whether Defendant's conduct alleged herein violates California's Unfair Competition Law;

(f)     Whether Plaintiff and the Class members are entitled to restitution; and

27

(g)    Whether Plaintiff and the Class members are entitled to attorneys' fees and costs.

56.    *Typicality*.   The claims of Plaintiff are typical of the claims of the Class members in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class members' affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the DAZN Subscriptions before charging their Payment Methods. All Class members were comparably injured by Defendant's wrongful conduct as set forth herein.  Further, there are no defenses available to Defendant that are unique to Plaintiff.

57.    *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class because he has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

58.    Moreover, the proposed Class can be maintained because it satisfies both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)    The expense and burden of individual litigation make it economically unfeasible for members of the Class to seek to redress their claims other than through the procedure of a class action;

(b)    If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Class to seek to redress their claims other than through the procedure of a class action; and

(c)    Absent a class action, Defendant will likely retain the benefits of its wrongdoing, and there will be a failure of justice.

## COUNT I
### Violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*
### (On behalf of the Class)

59.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

60.    California's Unfair Competition Law ("UCL") prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

61.    At all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.* Specifically, Defendant failed, and continues to fail, to: (a) provide the auto-renewal terms associated with its DAZN Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms

before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3). Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their DAZN Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

62.    Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

63.    All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq.*, constitute "unconditional gifts." *See* Cal. Bus. Prof. Code § 17603.  As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class members for their DAZN Subscriptions.  Defendant has profited from its unlawful and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

64.    Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

65.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

66.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

67.     Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the DAZN Subscriptions. Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their DAZN Subscriptions, paid as much for them, or would have canceled their DAZN Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees.  Thus, Plaintiff and the Class members were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

68.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the DAZN Subscriptions are still used by Defendant today.

69.     Because Plaintiff and the Class lack an adequate remedy at law, they seek restitution requiring Defendant to disgorge all the profits and gains it has reaped by charging their Payment Method for the DAZN Subscriptions in violation of the ARL and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil

Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)      For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)      For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(e)      For an order of restitution and all other forms of equitable monetary relief; and

(f)      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 12, 2024                Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By:  /s/ Adrian Gucovschi
        Adrian Gucovschi, Esq.

Adrian Gucovschi
Benjamin Rozenshteyn
Nathaniel Haim Sari (*pro hac vice* forthcoming)
140 Broadway, Suite 4667
New York, NY 10005
Tel: (212) 884-4230
adrian@gr-firm.com
ben@gr-firm.com
nsari@gr-firm.com

*Counsel for Plaintiff and the Class*